ORAL ARGUMENT NOT YET SCHEDULED

Appeal No. 12-7129

**In the United States Court of Appeals
for the District of Columbia Circuit**

_____

**BRUNO K. MPOY,**

*Plaintiffs-Appellant,*

*v.*

**THE DISTRICT OF COLUMBIA,**

**MICHELLE RHEE, and**

**DONALD PRESSWOOD,**

*Defendants-Appellees.*

_____

On Appeal from
the United States District Court for the District of Columbia
THE HONORABLE JAMES E. BOASBERG PRESIDING
U.S.D.C. Case No. 1:09-CV-01140-JEB

**BRIEF OF APPELLANT**

Stewart S. Manela
Jason D. Moore
Rachel M. Witriol
Arent Fox LLP
1717 K Street, NW
Washington, DC  20036-5342
(202) 857-6000

### CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellant Bruno Mpoy, through undersigned counsel, makes the following disclosures:

**(A)    Parties and Amici:** Bruno Mpoy was the plaintiff in the U.S. District Court for the District of Columbia ("District Court") and is the Appellant in this Court.  The District of Columbia, former District of Columbia Public Schools' Chancellor Michelle Rhee, and former District of Columbia Public Schools principal Donald Presswood were defendants in the District Court.  Defendants Rhee and Presswood are Appellees in this Court.

No intervenors or *amici* appeared before the District Court, and Appellant is not aware of any intervenors or *amici* in this Court.

**(B)    Rulings Under Review:**  The rulings under review in District Court Case No. 1:09-cv-01140 are an Order by The Honorable James E. Boasberg granting the motions for judgment on the pleadings filed by the District of Columbia and former District of Columbia Public Schools principal Donald Presswood, and filed by former District of Columbia Public Schools' Chancellor Michelle Rhee (District Court Docket No. 113), and the accompanying Memorandum Opinion (District Court Docket No. 114), both of which are dated November 5, 2012.  The official citation to the Memorandum Opinion is 901 F. Supp. 2d 144 (D.D.C. 2012).

These rulings disposed of the 42 U.S.C. § 1983 count against all defendants. The District Court declined to exercise supplemental jurisdiction with regard to Mr. Mpoy's non-federal claims. Therefore, the District Court's November 5, 2012 Order disposed of the case with respect to all issues and all parties and gave Mr. Mpoy a final, appealable judgment.

    **(C)    Related Cases:** Mr. Mpoy is the plaintiff in an appeal to the Superior Court for the District of Columbia of the order denying his administrative appeal of his termination, in accordance with District of Columbia law (2010 CA 004608 (MPA)).

                                                   Respectfully submitted,

Dated:      July 10, 2013                /s/    Stewart S. Manela
                                            Stewart S. Manela
                                          Arent Fox LLP
                                            1717 K Street, NW
                                          Washington, DC  20036-5342
                                            (202) 857-6000
                                          *Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ..................................................................1

STATEMENT OF THE ISSUES......................................................................1

STATEMENT OF THE CASE..........................................................................2

FACTUAL BACKGROUND .............................................................................5

SUMMARY OF THE ARGUMENT ................................................................10

LEGAL STANDARD.......................................................................................12

ARGUMENT ....................................................................................................13

I.  MR. MPOY HAS ADEQUATELY PLEADED THAT HE SPOKE
    AS A PRIVATE CITIZEN ON A MATTER OF PUBLIC
    CONCERN, AND THAT HIS SPEECH WAS A SUBSTANTIAL
    MOTIVATING FACTOR BEHIND THE APPELLEES'
    RETALIATORY ACTS, AND THE DISTRICT COURT'S
    DISMISSAL OF HIS § 1983 CLAIM SHOULD BE REVERSED...........13

    A.  Mr. Mpoy's Email to Appellee Rhee Included Statements On A
        Matter of Substantial Public Concern that were Unrelated to An
        Attempt to Implement His Job Functions, and Therefore Were Not
        Made Pursuant to His Official Duties. ................................................15

        1.  The District Court erred in holding that all of Mr. Mpoy's
            speech was pursuant to his official duties as a special
            education teacher. ........................................................................22

        2.  The District Court's application of the "chain of command"
            factor creates a presumption that all speech internal to an
            organization is unprotected.........................................................27

    B.  Mr. Mpoy Spoke About A Matter of Public Concern, At
        Minimum, When He Alleged That Presswood Had Falsified
        Student Achievement Records. ...........................................................32

    C.  The Complaint Sufficiently Alleges that Mr. Mpoy's Protected
        Speech was A Substantial or Motivating Factor Behind His

i

Termination, and That Any Alternative Justification for His
Termination is Mere Pretext...................................................................33

II.   RHEE AND PRESSWOOD ARE NOT ENTITLED TO QUALIFIED
      IMMUNITY BECAUSE MR. MPOY'S RIGHT TO BE FREE OF
      RETALIATION FOR EXERCISING HIS RIGHT TO FREE
      SPEECH WAS CLEARLY ESTABLISHED IN 2008. ...........................37

      A.   The Qualified Immunity Defense.........................................................38

      B.   Rhee and Presswood Cannot Plausibly Maintain That A
           Reasonable Official Would Not Have Known He Was Violating
           Mr. Mpoy's First Amendment Right to Speak As A Citizen On
           Matters of Public Concern..................................................................40

      C.   Mr. Mpoy's Right to Speak As A Citizen on Matters of Public
           Concern Was Clearly Established in 2008..........................................41

           1.   Garcetti did not alter the qualified immunity analysis, and the
                District Court erred in holding that confusion about Garcetti's
                application meant that reasonable officials would not have
                known that their actions violated Mr. Mpoy's rights. .................41

           2.   Courts have found a public employee's right to be clearly
                established in similar circumstances..............................................45

           3.   Rhee and Presswood had fair warning that Mr. Mpoy's speech
                was protected. ...............................................................................48

                i.   It was clearly established in 2008 that Mr. Mpoy's
                     speech involved a matter of public concern.........................49

                ii.  It was clearly established in 2008 that Mr. Mpoy's
                     speech was not made pursuant to his duties as a special
                     education teacher..................................................................50

CONCLUSION .......................................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. New York State Education Department*,
   752 F. Supp. 2d 420 (S.D.N.Y. 2010), *aff'd sub nom. Ebewo v. Fairman*,
   460 F. App'x 67 (2d Cir.), *cert. denied*, 133 S. Ct. 434 (2012) ........................26

*Am. Postal Workers Union v. U.S. Postal Serv.*,
   830 F.2d 294 (D.C. Cir. 1987)...............................................................................34

*Anderson v. Creighton*,
   483 U.S. 635 (1987).................................................................................................45

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................12

*Bame v. Dillard*,
   637 F.3d 380 (D.C. Cir. 2011)...............................................................................45

*Barham v. Ramsey*,
   434 F.3d 565 (D.C. Cir. 2006)...............................................................................39

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................12

* *Bernheim v. Litt*,
   79 F.3d 318 (2d Cir. 1996) .............................................................................33, 49, 50

* *Bowie v. Maddox*,
   642 F.3d 1122 (D.C. Cir. 2011),
   *cert. denied*, 132 S. Ct. 1636 (2012)...........................................14, 17, 25, 32, 34

* *Brammer-Hoelter v. Twin Peaks Charter Acad.*,
   492 F.3d 1192 (10th Cir. 2007) ........................................... 10, 23, 50, 51, 52, 53

*Butera v. Dist. of Columbia*,
   235 F.3d 637 (D.C. Cir. 2001).................................................................................39

*Cioffi v. Averill Park Central School District Board of Education*,
   444 F.3d 158 (2d Cir. 2006) ...................................................................................44

*City of San Diego v. Roe*,
  543 U.S. 77 (2004)..........................................................................32

*Clark Cnty. Sch. Dist. v. Breeden*,
  532 U.S. 268 (2001)........................................................................34

*Connick v. Myers*,
  461 U.S. 138 (1982).........................................................................23

*Decotiis v. Whittemore*,
  635 F.3d 22 (1st Cir. 2011)........................................................16, 27

*Doucette v. Minocqua, Hazelhurst & Lake Tomahawk Joint Sch. Dist. No. 1*,
  No. 07-292, 2008 WL 2412988 (W.D. Wis. June 12, 2008).............................42

*Ekwem v. Fenty*,
  666 F. Supp. 2d 71 (D.D.C. 2009)........................................................30

*Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*,
  605 F.3d 345 (6th Cir. 2010) ............................................................30

* *Garcetti v. Ceballos*,
  547 U.S. 410 (2006)................................................... 11, 14, 15, 16, 18, 26, 31,
                                         32, 41, 42, 43, 44, 45, 46, 51

*Handy-Clay v. City of Memphis*,
  695 F.3d 531 (6th Cir. 2012) ........................................................18, 20

*Hettinga v. United States*,
  677 F.3d 471 (D.C. Cir. 2012)...........................................................13

* *Hope v. Pelzer*,
  536 U.S. 730 (2002)....................................................................39, 40

*Jones v. Quintana*,
  831 F. Supp. 2d 75 (D.D.C. 2011).....................................................34, 46

*Karl v. City of Mountlake Terrace*,
  678 F.3d 1062 (9th Cir. 2012) .......................................................18, 20

*Keyser v. Sacramento City Unified Sch. Dist.*,
  265 F.3d 741 (9th Cir. 2001) ...........................................................34

iv

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004) ..............................................................48

*Knight v. Drye*,
    375 F. App'x 280 (3d Cir. 2010)..........................................................30

*LeFande v. Dist. of Columbia*,
    613 F.3d 1155 (D.C. Cir. 2010) ...........................................................32

*Lindsey v. City of Orrick*,
    491 F.3d 892 (8th Cir. 2007) .......................................................44, 46

*Massaro v. New York City Dep't of Educ.*,
    481 F. App'x 653 (2d Cir. 2012) .........................................................18

*McLaughlin v. Pezzolla*,
    No. 06-CV-00376, 2007 WL 676674 (N.D.N.Y. Feb. 28, 2007).......................47

*Miller v. Jones*,
    444 F.3d 929 (7th Cir. 2006) ..............................................................47

*Modica v. Humphrey*,
    No. A-02-CA-722 AWA, 2007 WL 2777779
    (W.D. Tex. Sept. 21, 2007)...........................................................44, 47

*Navab-Safavi v. Glassman*,
    637 F.3d 311 (D.C. Cir. 2011).............................................................38

* *O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998).........................................................43

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968)......................................... 13, 14, 16, 42, 43, 44, 45

*Rankin v. McPherson*,
    483 U.S. 378 (1987).........................................................................46

*Rollins v. Wackenhut Servs., Inc.*,
    703 F.3d 122 (D.C. Cir. 2012).............................................................12

* *Ross v. Breslin*,
    693 F.3d 300 (2d Cir. 2012) ...................................................16, 30, 31

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
    682 F.3d 1043 (D.C. Cir. 2012) ...........................................................................12

*Sanders v. Dist. of Columbia*,
    522 F. Supp. 2d 83 (D.D.C. 2007) ...............................................................47, 52

\* *Saucier v. Katz*,
    533 U.S. 194 (2001) .......................................................................................38, 39

*Tao v. Freeh*,
    27 F.3d 635 (D.C. Cir. 1994) ...........................................................................20

\* *Thompson v. Dist. of Columbia*,
    530 F.3d 914 (D.C. Cir. 2008) .............................................................16, 17, 25, 51

\* *Wilburn v. Robinson*,
    480 F.3d 1140 (D.C. Cir. 2007) .......................................................17, 25, 34, 51

*Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
    437 F. Supp. 2d 235 (D. Del. 2006) .................................................................52

*Williams v. Dallas Indep. Sch. Dist.*,
    480 F.3d 689 (5th Cir. 2007) ...........................................................................18

\* *Winder v. Erste*,
    566 F.3d 209 (D.C. Cir. 2009) ........................................... 17, 18, 19, 20, 21, 25

## OTHER AUTHORITIES

Emma Brown, *Federal complaint details cheating allegations at D.C. public
    school*, Washington Post, Jan. 7, 2013 ...............................................................33

Federal Rule of Civil Procedure 12(b)(6) .............................................................12

Federal Rule of Civil Procedure 12(c) ...................................................................12

*Webster's Ninth New Collegiate Dictionary* (1984) ..............................................19

Jack Gillum and Marisol Bello, *When standardized test scores soared in
    D.C., were the gains real?* .................................................................................33

Tom Howell Jr., *Investigation finds cheating at D.C. schools*, Washington
    Times, June 22, 2012 .........................................................................................33

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as Appellant's claim for damages for violation of his First Amendment rights arises under 42 U.S.C. § 1983.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which provides this Court with jurisdiction in appeals of all final decisions of the district courts of this Circuit. This appeal is from a final decision by the United States District Court for the District of Columbia, Hon. Judge James Boasberg, Presiding, granting the motions for judgment on the pleadings filed by Appellees Michelle Rhee and Donald Presswood as to the sole count of the Second Amended Complaint (the "Complaint") arising under federal law, and declining to exercise supplemental jurisdiction over Appellant's remaining state law claims. The District Court granted Appellees' motions on November 5, 2012. This appeal was timely noticed on December 4, 2012.

## STATEMENT OF THE ISSUES

**Issue 1:** The First Amendment protects a public employee from retaliation for speaking unless he speaks to implement a function of his job. Does the First Amendment protect a special education teacher with no employment responsibility to uncover or report fraud in the administration of standard tests at his school when he reports falsified tests scores and misrepresentations of student achievement by his principal to the Chancellor of the entire public school system?

**Issue 2:** Qualified immunity is not appropriate when an official retaliates against an employee who has exercised a clearly defined constitutional right.

1

The First Amendment right to free speech by a public employee is well-established for qualified immunity purposes.  Should Rhee and Presswood have been on notice that their retaliation against Mr. Mpoy for speaking as a citizen on a matter of public concern violated his right to free speech?

## STATEMENT OF THE CASE

On June 22, 2009, Mr. Mpoy filed a complaint against the District of Columbia ("The District"), Michelle Rhee and Donald Presswood, among other defendants.  J.A. 4, Dkt. No. 1.  On that same day, Mr. Mpoy filed a Motion for Leave to Proceed *In Forma Pauperis*, which the District Court granted.  J.A. 4-5, Dkt. No. 2.  He also filed a Motion to Appoint Counsel, which the Court granted on November 19, 2010.  J.A. 12-13, Dkt. No. 72.  Mr. Mpoy and his newly appointed counsel filed the Second Amended Complaint on June 15, 2011, alleging a violation of his First Amendment Rights under 42 U.S.C. § 1983, violations of the District of Columbia's Whistleblower Act and Human Rights Act, breach of contract for wrongful termination, breach of contract for failure to pay tuition, and civil conspiracy to wrongfully terminate Mr. Mpoy.  J.A. 13, Dkt. No. 77.[1]

---

[1]    The Second Amended Complaint was also filed against The New Teacher Project and DC Teaching Fellows.  On November 16, 2011, Mr. Mpoy filed a motion under Fed. R. Civ. P. 21 to drop DC Teaching Fellows as a defendant to this case, based on his understanding that DCTF is not a standalone legal entity. J.A. 14, Dkt. No. 81.  The Court granted the unopposed motion by minute order on February 23, 2012.  J.A. 16.  All counts against the New Teacher Project were dismissed by the court in its July 2, 2012 Order.  J.A. 16, Dkt. Nos. 90-91.

The District, Rhee, and Presswood filed a Motion to Dismiss the Second Amended Complaint on November 30, 2011, under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, or in the alternative, under Rule 56 for summary judgment.  J.A. 13, Dkt. No. 82.  On July 2, 2012, the Court granted in part and denied in part that motion, permitting Mr. Mpoy's 42 U.S.C. § 1983 and the civil conspiracy claim to proceed against Rhee and Presswood in their individual capacities.  J.A. 16, Dkt. Nos. 90-91.  The Court also dismissed Mr. Mpoy's claim for punitive damages against the District, but permitted all other claims to proceed against the District, Rhee, and Presswood.

The District, Rhee, and Presswood filed Motions for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c) on August 20, 2012.  J.A. 45-56.  On November 5, 2012, the Court dismissed Mr. Mpoy's only federal claim, 42 U.S.C. § 1983, and declined to exercise supplemental jurisdiction over the remaining state-law claims.  J.A. 57-80.

In dismissing the § 1983 claim, the court erred in holding that Mr. Mpoy's speech was made pursuant to his official duties because his disclosures were "part-and-parcel of his concerns as a school teacher," despite acknowledging that one of his disclosures did not "pertain to actions that exclusively involve Mpoy's classroom."  J.A. 71-72.  Specifically, the court recognized that the disclosure alleging that Presswood falsified the DC-CAS Alternative "can be understood to

3

raise broader claims about the functioning of the school," but dismissed this in ruling that the speech as a whole only concerned Mr. Mpoy's job duties at Ludlow. J.A. 72-76.

The court also erred in finding that "the fact that Mpoy raised his complaints up the chain of command supports the Court's conclusion that the speech was undertaken pursuant to his job." J.A. 76. Although the court recognized that this was not dispositive, the court suggested that if Mr. Mpoy had instead raised his complaints to the media, the outcome would have been different. *Id.*

Finally, the District Court further erred in holding, in the alternative, that Mr. Mpoy's § 1983 claim was nonetheless barred by qualified immunity. J.A. 77. The court found that "the contours of the right at issue in this case were not sufficiently clear such that Defendants Rhee and Presswood would have reasonably understood that their actions violated Mpoy's rights." *Id.* In so holding, the court relied on its analysis that Mr. Mpoy's speech was not protected, and also relied on what the court considered the "uncertainty of the public-employee-speech jurisprudence as it applies to teachers in different settings." J.A. 77-78. Mr. Mpoy timely noticed this appeal of the District Court's dismissal of his § 1983 claim. J.A. 19, Dkt. No. 116.

4

## FACTUAL BACKGROUND

In April 2007, appellant Bruno Mpoy was hired in probationary status as a special education teacher by the District of Columbia Public School system ("DCPS").  He was hired through a DCPS partnership program with The New Teacher Project ("TNTP") called "DC Teaching Fellows" which recruited first-time teachers and put them straight into the classroom in "high need" District of Columbia schools, and provided recruits with tuition assistance so they could become certified career teachers.  J.A. 23-25, at ¶ 19, 31.  Upon entering the program, Mr. Mpoy was given a provisional teaching license, a position at Ludlow Elementary School ("Ludlow"), and tuition assistance toward earning his teaching certificate from the George Washington University Graduate School of Education.  J.A. 25-26, at ¶¶ 30-35.  In exchange, Mr. Mpoy promised to remain in his position at Ludlow—a "high need" school—for a minimum of four years.  J.A. 25, at ¶ 31.

Mr. Mpoy started at Ludlow in the summer of 2007, and brought substantial passion to his second career.  J.A. 26, at ¶¶ 37-41.  An immigrant from the Congo with a Master of Science degree, Mr. Mpoy approached his new role with enthusiasm and a desire to provide his students with the best education he could.  J.A. 23, 26, at ¶¶ 16, 40-41.  He spent several days cleaning his new classroom and preparing it for instruction, hoping to create an environment conducive to learning,

and even purchased books and other supplies for his students when the school failed to provide them.  J.A. 26, at ¶¶ 40-41.

Over the course of the next few months, Mr. Mpoy encountered numerous problems at Ludlow and in his classroom.  He raised these issues with his principle, Appellee Presswood, but was generally met with apathy and a lack of interest in Mr. Mpoy's success as a teacher or his students success at learning.  *See* J.A. 27-28, at ¶¶ 43-45, 51-62.  Mr. Mpoy became convinced that Presswood's failures to address these issues fostered waste and abuse of public funds, unethical conduct, and violations of federal law.  J.A. 35-36, at ¶¶ 111, 115.

Things came to a head when Mr. Mpoy advised Presswood that his students did not display a level of achievement commensurate with their grade level.  J.A. 30, at ¶¶ 69-70.  Under the No Child Left Behind Act of 2001, Pub. L. No. 107-110 (codified as amended in scattered sections of U.S.C.), public schools must establish learning benchmarks and monitor student performance to ensure yearly achievement commensurate with their grade level, with the goal of preventing students from graduating without the ability to read or do basic math.  J.A. 29, at ¶ 63.  A considerable amount of a school's annual funding is dependent on its adequately teaching a high percentage of its students to meet these yearly achievement goals.  In the District of Columbia, student achievement is measured by a standardized testing system called the District of Columbia Comprehensive

Assessment System ("DC-CAS"). J.A. 30, at ¶ 64. Special education students are assessed according to a heavily modified system called the DC-CAS Alternative. *Id*. Under this system, the special education teacher individually assesses each student's knowledge and achievement level to determine her grade-level knowledge, then teaches the student toward achieving her next grade level. J.A. 30, at ¶ 66. Assessments are conducted on a weekly or bi-weekly basis, so that the student's progress may be monitored until the next grade level is achieved. *Id*.

Mr. Mpoy taught a classroom of ten special education students who were assessed at a variety of grade levels. J.A. 53. Throughout the year, Mr. Mpoy assessed his students and determined that they were making some progress. However, not only were his students not measuring at the next grade level to show adequate yearly progress, they were not even measuring at grade levels appropriate for their ages. J.A. 30, at ¶ 69. Rather than support him, Presswood instructed Mr. Mpoy to fabricate acceptable performance results. J.A. 30, at ¶ 70.

When Mr. Mpoy refused, Presswood enlisted two other teachers at Ludlow to fabricate a record of achievement. J.A. 31, at ¶ 72. Under Presswood's direction, those teachers conducted sham assessments of Mr. Mpoy's students, giving the students answers to questions presented by the assessments, or simply writing answers in themselves. J.A. 31, at ¶¶ 73-74. Their written statements summarizing the students' levels of achievement were simply falsified. J.A. 31, at

7

¶ 74. Presswood also altered existing assessment records to show inflated performance. *Id*. Instead of helping Mr. Mpoy educate his students, Presswood chose to break the law and work around Mr. Mpoy to make it appear Ludlow was meeting its students' needs.

At the same time, Presswood worked to undermine Mr. Mpoy's employment with DCPS. J.A. 31-32, at ¶¶ 76-85. He had conducted a formal observation of Mr. Mpoy's classroom in December 2007, but failed to give Mr. Mpoy any feedback from that observation or issue a performance evaluation. Instead, over the course of the next few months, he issued a series of baseless warning letters to Mr. Mpoy, falsely accusing him of tardiness, corporal punishment, failing to follow lesson plans, and failing to monitor and escort his disabled students. J.A. 31-32, at ¶¶ 79-81. Having fabricated a paper-trail painting Mr. Mpoy as a problem employee, Presswood had Mr. Mpoy suspended without pay in May 2008 for "insubordination" and failing to follow instructions from his supervisor. J.A. 32, at ¶¶ 82-83.

Concerned both that students at Ludlow were not being educated and that Presswood was continuing to falsify achievement records in violation of federal law, on Monday, June 2, 2008, Mr. Mpoy wrote an email to then Chancellor of DC Schools, Appellee Michelle Rhee. J.A. 32, at ¶ 86. The email requested an investigation and laid out numerous allegations about ways that Presswood was

8

wasting funds, impeding student learning, and violating the law.  Chief among these, Mr. Mpoy reported to Rhee in unequivocal terms that Presswood had "misrepresented students' performance and results on the DCCAS Alternative." J.A. 52.

Just two days later, Mr. Mpoy was summoned to Presswood's office.  There, in the presence of Cynthia Bell, DCPS Assistant Director for Special Education, and Tara Williams, director of the DC Teaching Fellows program for TNTP, J.A. 32, at ¶ 87, Presswood threatened that he would not recommend Mr. Mpoy's re-appointment.  J.A. 32, at ¶ 88.  Nine days after that, on June 13, Presswood finally issued his performance evaluation of Mr. Mpoy based on the observation he had conducted in December 2007, rating Mr. Mpoy as either ineffective or needing improvement in every category of assessment.  J.A. 33, at ¶ 90.  This evaluation was baseless.  J.A. 33, at ¶ 91.

A little more than a month later, on July 9, 2008, Mr. Mpoy was summoned to a meeting with DCPS and Rhee representative Ronald Williams, at which Tara Williams was also present.  J.A. 33, at ¶ 94-95.  Tara Williams informed Mr. Mpoy that Presswood had made good on his threat of June 4 and had recommended that Rhee terminate Mr. Mpoy.  J.A. 33, at ¶ 95.  Ronald Williams confirmed that Mr. Mpoy would be terminated from his position, and informed him that he should expect to receive a termination letter.  J.A. 34, at ¶ 97.  That letter was issued a few

days later on July 15, 2008, although Mr. Mpoy did not receive it until August 19, 2008, when Mr. Mpoy reported to work at Ludlow, only to be informed by Ludlow's new principal that he had been sacked.  J.A. 34, at ¶ 98-101.

## SUMMARY OF THE ARGUMENT

Clear precedent from the Supreme Court and this Court hold that public employees may be deprived of First Amendment protection for their speech only when that speech is made pursuant to official duties, or in an attempt to implement a function of their job.  Appellant Bruno Mpoy had no job-related duty or function that was served by his statement to Appellee Rhee that Appellee Presswood had falsely inflated student standardized achievement test records.  The District Court below erred in holding that all of Mr. Mpoy's speech to Rhee dealt with mere obstacles to the performance of Mr. Mpoy's day to day duties and therefore was pursuant to his official duties, even as it acknowledged that his statements regarding Presswood's cheating raised larger issues beyond the bounds of Mr. Mpoy's classroom.  The District Court should have viewed that statement in Mr. Mpoy's request for an investigation in isolation, and concluded that Mr. Mpoy did not make that statement in an attempt to implement a job function.

Further, to the extent the District Court looked beyond the scope of Mr. Mpoy's duties as alleged in the Complaint in search of other indicia that his speech may have been pursuant to official duties, the Court inappropriately relied on the

10

fact that Mr. Mpoy spoke to the public official with all administrative and operational authority for the District of Columbia Public School system, rather than to the media. The District Court found that Rhee was within Mr. Mpoy's "chain of command," so that it might be presumed that his speech was pursuant to his official duties. Such a broad interpretation of the "chain of command" test— presumptively depriving a low-level employee of First Amendment rights when he bypasses all intermediary supervisors and speaks directly to the head of his public agency—creates the presumption that all speech internal to a public organization is made pursuant to official duties, depriving public employees of their First Amendment rights unless they speak to third parties or the media. This interpretation of Mr. Mpoy's "chain of command" must be rejected.

Finally, the District Court found that Rhee and Presswood are entitled to qualified immunity because the state of the law concerning application of the standard announced in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) in the academic setting was unclear in 2008. This conclusion misapplies the qualified immunity test in a manner that would effectively award qualified immunity to all public managers who retaliate against their employees for engaging in speech. Mr. Mpoy's right to speak as a citizen on matters of public concern without fear of retaliation was clearly established in 2008; whether or not *Garcetti* applied in the academic setting, the law was settled that the First Amendment protects from

11

retaliation one who spoke as Mr. Mpoy did—pursuant to his interests as a citizen, and not pursuant to his official duties.  Accordingly, the District Court's award of qualified immunity to Rhee and Presswood should be reversed.

## LEGAL STANDARD

A Rule 12(c) motion for judgment on the pleadings is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012) (holding a 12(c) motion is "functionally equivalent to a Rule 12(b)(6) motion" and subject to the same standard).  A court presented with a 12(c) motion therefore must determine if the complaint states "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  A properly pleaded complaint will plead enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "'Facts that are merely consistent with a defendant's liability' and demonstrate only a possibility, but not the plausibility, of relief fail to satisfy this standard." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 870 (2013).  Moreover, "[t]he Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of

12

all inferences that can be derived from the facts alleged.'"  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States,* 617 F.2d 605, 608 (D.C. Cir. 1979)), *cert. denied*, 133 S. Ct. 860 (2013).

This Court's standard of review is *de novo*.  *Id*. (citing *Atherton v. Dist. of Columbia,* 567 F.3d 672, 681 (D.C. Cir. 2009)).

## ARGUMENT

I.    **MR. MPOY HAS ADEQUATELY PLEADED THAT HE SPOKE AS A PRIVATE CITIZEN ON A MATTER OF PUBLIC CONCERN, AND THAT HIS SPEECH WAS A SUBSTANTIAL MOTIVATING FACTOR BEHIND THE APPELLEES' RETALIATORY ACTS, AND THE DISTRICT COURT'S DISMISSAL OF HIS § 1983 CLAIM SHOULD BE REVERSED.**

In the court below, Appellees Rhee and Presswood argued—and the court agreed—that Mr. Mpoy was not entitled to the protections of the First Amendment when he reported fraudulent and illegal activities at his school to Appellee Rhee— a high-profile public official and the head of the DCPS system.  Despite clear guidance from this Court, the District Court held that Mr. Mpoy's speech was made entirely as a public employee, even though it acknowledged that some of his speech did not address the day to day operations of his classroom and even though that speech was not an attempt to implement the functions of his job.  This was error.

Public employees have a right to speak as citizens on matters of public concern without fear of retaliation from their government employers.  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) (a public employee's "exercise of his right

13

to speak on issues of public importance may not furnish the basis for his dismissal from public employment"). "The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti v. Ceballos*, 547 U.S. 410, 417 & 419 (2006). The right is not absolute, however; a public employer may restrict an employee's speech on a matter of public concern only to the extent necessary for efficient operations. *Id*. at 419. A balance must be struck between the employee's fundamental rights and the employer's interest in promoting the efficiency of public service, *Pickering*, 391 U.S. at 568, and the public interest in well-informed government employees engaging in civic discussion. *Garcetti*, 547 U.S. at 419.

This Court has established a four-factor test to aid in balancing these competing interests when a public employee alleges that he was the victim of retaliation for exercising his free speech rights. *Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011), *cert. denied*, 132 S. Ct. 1636 (2012).

> *First*, the public employee must have spoken as a citizen on a matter of public concern. *Second*, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. *Third*, the employee must show that [his] speech was a substantial or motivating factor in prompting the retaliatory or punitive act. *Finally*, the employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

14

*Id*. (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007))

(emphasis added).  These factors are addressed below.

> ### A.    Mr. Mpoy's Email to Appellee Rhee Included Statements On A Matter of Substantial Public Concern that were Unrelated to An Attempt to Implement His Job Functions, and Therefore Were Not Made Pursuant to His Official Duties.

The Court first must determine whether the employee spoke as a private

citizen on a matter of public concern.  This requires an examination of whether the

relevant statements were made pursuant to an employee's official duties.  *Garcetti*,

547 U.S. at 421.  The *Garcetti* Court held, "the First Amendment does not prohibit

managerial discipline based on an employees' expressions made pursuant to

official responsibilities."  *Id*. at 424.

In *Garcetti* the Supreme Court cautioned that its holding should not be read

as to permit government "employers [to] restrict employees' rights by creating

excessively broad job descriptions."  *Id*.  Noting that "[f]ormal job descriptions

often bear little resemblance to the duties an employee actually is expected to

perform," the Court warned that even "the listing of a given task in an employee's

written job description is neither necessary nor sufficient to demonstrate that

conducting the task is within the scope of the employee's professional duties for

First Amendment purposes."  *Id*. at 424-25.  Thus, whether an employee's

expression was made pursuant to official duties is "a 'practical' inquiry—focusing

15

not on formal job descriptions, but on the employees' actual responsibilities."
*Thompson v. Dist. of Columbia*, 530 F.3d 914, 916 (D.C. Cir. 2008) (quoting
*Garcetti*, 547 U.S. at 424). The *Garcetti* court noted specifically, that speech by
teachers that concerns the overall operation of their school, while related to the
subject matter of their employment, is not pursuant to their teaching duties. *See*
547 U.S. at 421 (quoting *Pickering*, 391 U.S. at 572).

Since *Garcetti*, courts have relied on a variety of factors to determine
whether an employee's speech was "pursuant," and not merely *related*, to official
duties. "The inquiry into whether a public employee is speaking pursuant to her
official duties is not susceptible to a brightline rule," but is heavily dependent on
the facts of a given case. *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012); *see
also Garcetti*, 547 U.S. at 420-21 (whether the speech occurred inside the office, or
whether it concerned the subject matter of the employment, are factors to consider,
but are not dispositive); *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011)
(listing "non-exclusive" factors such as subject matter; whether employee was paid
for speech; whether speech made "up the chain of command;" whether employee
spoke at place of employment; whether speaker gave impression of speaking on
behalf of employer; whether speech reflected special knowledge; whether there is a
"citizen analogue" to speech).

16

The D.C. Circuit has distilled the Supreme Court's "pursuant to official duties" requirement to a practical test that asks whether the employee's speech was "an attempt to implement a job function." *Winder v. Erste*, 566 F.3d 209, 216 (D.C. Cir. 2009). *Accord Bowie,* 642 F.3d at 1135 (employee who was directed to speak by his employer spoke to carry out his duty as an employee); *Thompson*, 530 F.3d at 918 (based on general nature and duties of position relating to integrity of operations and finances, employee's reports concerning misconduct by members of D.C. Lottery Board were made pursuant to the functions of his job); *Wilburn*, 480 F.3d at 1150 (human resources supervisor officially tasked with rooting out discriminatory employment practices spoke pursuant to official duties when reporting discriminatory promotion denials).

*Winder* illustrates what employee speech that attempts to implement a job function looks like.  In *Winder*, the plaintiff had been hired by DCPS as General Manager of transportation.  566 F.3d at 211.  In that role, he was tasked with helping DCPS implement court orders related to school busing services, and was required to coordinate closely with the Special Master appointed by the court to oversee implementation of those orders.  *Id*.  During the course of his employment, Winder reported to the Special Master instances of "resist[ance] and interfer[ence] with efforts to comply with" the orders by his superiors.  *Id*.  He also reported their interference to the D.C. Inspector General.  *Id*. at 212.  The Court noted that, by

17

making these statements, "Winder was fulfilling his undisputed duty to see that [the court's] orders were implemented." *Id*. at 215.  The Court found that Winder's speech more than merely "concerned his official duties"; rather, "in each instance Winder's speech was an attempt to implement" his specific job duties, and his speech "was therefore 'pursuant to' his official duties." *Id*. at 216 (internal quotations omitted).  *See also Karl v. City of Mountlake Terrace,* 678 F.3d 1062, 1071 (9th Cir. 2012) (work-product based on public employee's professional responsibilities not protected but speech on matter of public concern protected if speaker had no duty to make statements or speech not product of performing tasks employee was paid to perform); *Massaro v. New York City Dep't of Educ.*, 481 F. App'x 653, 655 (2d Cir. 2012) (speech deemed pursuant to employee's official duties if part-and-parcel of concerns about ability to execute duties) (quoting *Weintraub v. Bd. of Educ.,* 593 F.3d 196, 202 (2d Cir. 2010)); *Handy-Clay v. City of Memphis*, 695 F.3d 531, 542 (6th Cir. 2012) (reports regarding absenteeism, corruption, and mismanagement of public funds were not pursuant to official duties as a public records coordinator); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007) (school athletic director who wrote to request information to properly execute duties spoke pursuant to official duties).

The intuitive "attempt to implement" test followed in this Circuit finds support in the plain language of the Supreme Court's guidance in *Garcetti*.

18

*Webster's Ninth New Collegiate Dictionary* defines "pursuant to" to mean "carrying out; in conformity with; according to." *Id*. at 957 (1984). Only speech which flows from or is intended to support the "carrying out" of one's responsibilities, or which is compelled or expected because of those responsibilities, is made "pursuant to" those responsibilities. Speech that is merely "related to" or "concerns" an employee's job does not meet the standard. *See Winder*, 566 F.3d at 216 ("Speech can be covered by the First Amendment even if it is related to one's job function"; not all "speech that concerns an employee's job duties" is unprotected).

It is unsurprising, then, that other Circuits have taken a consistent view. In *Reinhardt v. Albuquerque Public Schools Board of Education*, the Tenth Circuit found it dispositive that the plaintiff—a speech-language pathologist who had filed a complaint with the New Mexico Public Education Department alleging violations of the federal Individuals with Disabilities Education Act ("IDEA") by the Albuquerque Public School System—"was not hired to ensure IDEA compliance at Albuquerque public schools. She was hired to provide speech and language services to special education students," so that her reports were not pursuant to her job duties even though they related to the subject matter of her position. 595 F.3d 1126, 1136 (10th Cir. 2010). Similarly, in *Davis v. McKinney*, where an auditor within the Information Systems division of a public university had sent a letter of

19

complaint to various officials within her chain of command, the Fifth Circuit found that those portions of the letter that addressed issues "related to . . . her core job description" were made pursuant to her official duties. 518 F.3d 304, 315 (5th Cir. 2008). However, those portions of her letter that dealt with allegations unrelated to information systems audits—even though the facts supporting those allegations were gathered in the course of her employment—were <u>not</u> made pursuant to official duties. *Id*.; *see also Karl*, 678 F.3d at 1071-72 (plaintiff's statements made in the course of testimony during litigation was "the product of a subpoena" and not work "commissioned or created" by her employer, even though she was asked to testify on topics related to her employment); *Handy-Clay*, 695 F.3d at 542 (public records coordinator's duties did not include reporting government corruption and mismanagement of public funds, even though matters were observed during employment); *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192 (10th Cir. 2007) (teachers with no supervisory responsibilities and no duty to report problems at their school did not speak pursuant to official duties, even though subject matter of speech related to their employment at the school); *cf. Tao v. Freeh*, 27 F.3d 635, 640 (D.C. Cir. 1994) (FBI translator's job duties did not include exposing or preventing discrimination, so that her reports of racial discrimination were not pursuant to her duties), *cited in Winder*, 566 F.3d at 215.

20

When trying to determine if an employee is speaking "pursuant to official duties," courts have looked to the audience who received the statement for indications that it was made in an attempt to carry out a job function. The Courts of Appeals "are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job." *Davis*, 518 F.3d at 313. However, the fact that a report was made "within" a chain of command is not dispositive of the report's character as one either attempting to implement a job function or not. Thus, in *Winder*, this Court observed that the D.C. Circuit has "consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, *even if the report is made outside his chain of command*." 566 F.3d at 215 (emphasis added). Because Winder's speech demonstrated that his purpose was to implement a job function, it was irrelevant that he spoke outside his chain of command. *Id*. Likewise, in *Davis*, the Fifth Circuit gave no weight to the fact that Davis spoke *within* her chain of command when her speech was not an attempt to carry out her duties as an information systems auditor. 518 F.3d at 315. Importantly, no court has categorically held that all statements made within an employee's "chain of command" lack protection by the First Amendment.

21

1.    **The District Court erred in holding that all of Mr. Mpoy's speech was pursuant to his official duties as a special education teacher.**

The District Court in this case found that Mr. Mpoy's June 2, 2008, email to Michelle Rhee reflected "his concerns as a school teacher." J.A. 17[2] The District Court concluded that "[t]he 'form and context' in which Mpoy's complaints were made 'are indicative of the fact that they intended to address only matters connected with' his job at Ludlow." *Id*. at 73 (quoting *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007)).

However, after recounting the "eight enumerated grounds for investigation" in Mr. Mpoy's email, the court acknowledged that only "seven pertain to actions that exclusively involve Mpoy's classroom." *Id*. at 72.  In fact, the court affirmed that Mr. Mpoy's "third claim alleging that [Presswood] 'misrepresented students' performance and results on the DCCAS Alternative' can be understood to raise broader claims about the functioning of the school." *Id*.  Nevertheless, the court proceeded to analyze all of Mr. Mpoy's communication with Rhee as if every element of the communication dealt exclusively with obstacles to the adequate performance of his classroom duties.

---

[2]    The District Court relied on the June 2, 2008, email to Rhee even though it was not attached to the Second Amended Complaint, on the grounds that the email was incorporated into the Complaint by reference, permitting the court to consider it without converting Appellees' 12(c) motion into one for summary judgment. J.A. 71 n.1.

22

The District Court erred when it failed to analyze Mr. Mpoy's email as one involving "mixed speech."  Other courts of appeals, as well as "[p]re-*Garcetti* case law . . . support[] analyzing mixed speech in a single communication by dividing the communication by topic and applying First Amendment analysis to each topic separately."  *Davis*, 518 F.3d at 314.  Indeed, as the Fifth Circuit noted in *Davis*, the Supreme Court's seminal decision in *Connick v. Myers*, 461 U.S. 138 (1982), itself analyzed a single communication by Myers according to various component subparts when determining whether the discrete statements in the communication were "on a matter of public concern."  *Id*. at 314-15.  Here, the District Court should have analyzed each component of Mr. Mpoy's challenged speech to determine whether any subpart of that speech might be deemed to have been made as a citizen and not pursuant to official duties.  *See also Brammer-Hoelter*, 492 F.3d at 1199 (holding that most of the plaintiffs' statements were made pursuant to their duties as teachers, but that at least some of their speech concerned matters for which they had no supervisory responsibility nor any duty to report).

Had the court indulged in that analysis, it would have reached a different ruling.  Viewing Mr. Mpoy's email in its component pieces, it is apparent that Mr. Mpoy's statement regarding falsification of student achievement records by Presswood stands uniquely apart from the rest of his communication.  Mr. Mpoy was a probationary, provisionally licensed elementary special education teacher.

23

He enjoyed no—and more importantly, has not alleged that he enjoyed—administrative, managerial or supervisory responsibilities at Ludlow; indeed, the Complaint shows that he had no managerial authority even over the teaching aids assigned to his own classroom.  *See* J.A. 27-29, at ¶¶ 46-62 .  The District Court emphasized that Mr. Mpoy himself alleged that his "primary duty is to ensure student achievement."  J.A. 71 (quoting J.A. 52).

Even if the remainder of Mr. Mpoy's allegations relate to obstacles to the adequate performance of his classroom duties, his allegation regarding misrepresentation does not.  It is unrelated to the supplies available to his classroom, the behavior and failures of the teaching aids assigned to his classroom, Presswood's failure to provide feedback, or Presswood's failure to address Mr. Mpoy's concerns about his teaching aids.  *See* J.A. 72-73.  Instead, by that statement, Mr. Mpoy reported malfeasance and fraud that amounts to a violation of Federal and District law, and the import of that statement cannot have been lost on Appellees.  Even if Mr. Mpoy spoke pursuant to his official duties throughout the remainder of the email,[3] he did not speak "pursuant to," "to carry out," "in

---

[3]     Appellant does not concede that the remainder of his email did not allege serious misuse of public funds, violations of DPCS policy, and violations of District and Federal Law.  Although his email may not state it clearly, his other allegations regarding allege fundamental violations of the Individuals with Disabilities Education Act (IDEA), Pub. L. No. 101-476, 20 U.S.C. § 1400 *et seq.* (2004).  For present purposes, the Court need not trouble with whether those statements were made pursuant to official duties—although they remain important

24

conformity with," or "in accordance with" any official duty by making this report to Rhee.  As an employee, it was not his responsibility to ensure that his supervisor acted ethically and legally; unlike the plaintiffs in *Thompson* and *Wilburn*, he bore no broader compliance responsibility for Ludlow and had no authority or mandate to seek out the kind of malfeasance displayed by Presswood.  Moreover, reporting Presswood's misrepresentations did not even advance Mr. Mpoy's acknowledged "primary duty" of "ensur[ing] student achievement," unlike the plaintiff in *Winder*. Mr. Mpoy's job was to educate his students to meet their individual educational goals; Presswood's misrepresentations of their performance under the DCCAS Alternative did not obstruct that duty.  And, importantly, unlike the plaintiff in *Bowie*, Mr. Mpoy expressly alleged that he was not instructed, invited, or otherwise obligated by DCPS to report what he knew about Mr. Presswood.  J.A. 35, at ¶ 112.[4]

Instead, his speech about Presswood's cheating concerned the overall operation of the school and was merely related to his employment functions.  *See*

statements on troubling illegal conduct for purposes of Appellant's claims under the D.C. Whistleblower Protection Act.  *See* J.A. 36.

[4]     It bears repeating here that the factual scope of Mr. Mpoy's employment duties, either official or practical, is not in the record before the Court.  The task before this Court, as it was in the district court, is to evaluate Mr. Mpoy's pleading to determine whether he states a cause of action that is plausible on its face.  Mr. Mpoy has alleged that he was under no obligation and had no duty to report Presswood's misrepresentations to Rhee or DCPS; to the extent the Court may suspect that this allegation is factually inaccurate, that question of fact should be resolved in the district court on remand.

*Garcetti*, 547 U.S. at 421. Exactly like the plaintiff in *Reinhardt*, "[Mr. Mpoy] was not hired to ensure [No Child Left Behind] compliance at [District of Columbia] public schools. [H]e was hired to provide [educational instruction] to special education students." 595 F.3d at 1136.

Perhaps cognizant of this distinction—although it did not leverage its holding on this consideration—the District Court cited *Adams v. New York State Education Department*, 752 F. Supp. 2d 420, 429-30 (S.D.N.Y. 2010), *aff'd sub nom. Ebewo v. Fairman*, 460 F. App'x 67 (2d Cir.), *cert. denied*, 133 S. Ct. 434 (2012). In *Adams*, the court "rejected claims by teachers that the complaints they had filed with school authorities alleging a principal's falsification of attendance and grade records was [sic] not related to their responsibilities as public school teachers." J.A. 70-71. The *Adams* court held that it was absurd for the teachers to maintain that "a public school principal's explicit order to a teacher directing her to falsify her own student's grades 'has no bearing' on the teacher's official responsibilities." *Adams*, 752 F. Supp. 2d at 430 (*quoted in* Mem. Op. at J.A. 71). Rather, the court held that the teachers' complaints about the principal's actions were "'part-and-parcel' of their concerns as school teachers." *Id*. To the extent that the District Court here intended this discussion to suggest that Mr. Mpoy's report about Presswood's falsifications was similarly "'part-and-parcel' of his concerns as a teacher," that conclusion is error. The Circuits are unanimous that

26

"[n]othing in *Garcetti* or the decisions interpreting it can fairly be read to suggest that all speech tangentially or broadly relating to the work of a public employee is per se unprotected." *Decotiis*, 635 F.3d at 33. Mr. Mpoy may only be denied First Amendment protection for his speech if that speech is "pursuant to his official duties," or as this Court has articulated, was "an attempt to implement a job function." Whether or not the subject matter of his statement reflected his "concerns as a teacher," the relevant inquiry is whether Mr. Mpoy's duties, as officially and practically defined, required, obligated, encouraged, or were otherwise carried out or advanced by the content of his speech. While Mr. Mpoy certainly was "concerned" that Presswood had falsified student achievement records, that concern does not transform his speech into an attempt to implement the responsibilities of his job.

> **2.     The District Court's application of the "chain of command" factor creates a presumption that all speech internal to an organization is unprotected.**

In this context, it is likewise irrelevant that Mr. Mpoy reported Presswood's malfeasance to the top official in DCPS. Although the court below emphasized that it was "not dispositive," it nevertheless placed substantial support for its decision on "the fact that Mpoy raised his complaints up the chain of command." J.A. 76. The court found that, despite the distance between Mr. Mpoy and Rhee on that "chain," nevertheless, "[a]s Chancellor, Rhee was responsible for the

27

administration of the District's school system, and Mpoy's decision to raise internal complaints with her, as opposed to the media, further supports the conclusion that his speech was made pursuant to his duties as [a] teacher." *Id.*

This reliance on who received Mr. Mpoy's report is error for two reasons. First, even if Mr. Mpoy reported "up the chain of command," the audience he chose to report to is irrelevant if his speech about Presswood's falsifications did not flow from an attempt to implement or carry out a job function.  Mr. Mpoy's email is comparable to the letter at issue in *Davis*, where Davis informed the university official with ultimate authority over her purview about matters both germane and unrelated to her duties as an auditor of information systems.  The Fifth Circuit found that Davis's statements regarding appointment and employment matters were not made pursuant to her official duties because the subject matter of the complaints differed from the subject matter of her responsibilities, even though she reported within her chain of command.  *See* 518 F.3d at 315.  Similarly here, even if Mr. Mpoy spoke within his chain of command, his reports about Presswood's falsifications were not an attempt to implement his job responsibilities; his decision to report "within his chain of command" does not operate to transform his duties and render his communication about Presswood's falsifications "pursuant to his official duties."

28

Second, to the extent Mr. Mpoy's speech regarding Presswood's falsifications is arguably "pursuant to his official duties," sending the court in search of other signs by which to determine whether he spoke in an official or private capacity, then the District Court's understanding of the DCPS chain of command would have devastating effects on First Amendment freedoms in the public workplace.  The District Court found that Rhee, as Chancellor of DCPS, was "within" Mr. Mpoy's chain of command because he was employed by DCPS, of which Rhee was the top official.  Although the full bureaucratic breadth of the DCPS system is not available in the record, based simply on Mr. Mpoy's Complaint it would be hard to conceive of someone lower on the DCPS chain than him.  Mr. Mpoy was a first year special education teacher in probationary status and only provisionally certified to teach.  J.A. 26, at ¶¶ 34-35.  He was in charge of a single classroom of ten disabled students.  J.A. 53.  To borrow an illustration from the military, from which the courts borrowed the metaphor of a "chain of command," Mr. Mpoy was a private to Rhee's Secretary of Defense.

Such a breathtakingly broad interpretation of the "chain of command" factor would effectively create a presumption that individuals who speak about topics related to their jobs cannot enjoy First Amendment protection unless they speak entirely outside their own organization.  The District Court, in fact, stated that it might not have viewed Mr. Mpoy's statements as pursuant to official duties if he

29

had raised his complaints "to the media" rather than to the individual with legal authority over the organization. J.A. 76. Appellant can find no authority to support the notion that speech internal to an organization is presumptively to be viewed as "pursuant to official duties."

Instead, it is apparent from the case law that courts tend to use the "chain of command" metaphor to refer to a routine reporting structure observed when conducting official duties. *See Davis*, 518 F.3d at 315 (observing that, organizationally, plaintiff spoke to an individual within her "chain of reporting responsibilities on internal audit issues"); *Ross v. Breslin*, 693 F.3d 300, 307 (2d Cir. 2012) (noting that plaintiff had routinely brought payroll irregularities to the defendant pursuant to her duty to raise such issues to "the appropriate person's attention"); *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 347 (6th Cir. 2010) (teacher who reported problems in her classroom to her principal and her school's special education director did so within "the ordinary chain of command at her school"); *Knight v. Drye*, 375 F. App'x 280, 282 (3d Cir. 2010) (municipal police officer who reported misconduct to his supervisor and town police chief reported within his chain of command); *Ekwem v. Fenty*, 666 F. Supp. 2d 71 (D.D.C. 2009) (employee who reported overburdened staff to his supervisor and his supervisor's supervisor reported up the chain of command). In this way, an employee who reports misconduct first to his supervisor—or, if the misconduct

30

was by his own supervisor, then to the person vested with supervisory authority over that individual—and then, sequentially, to the next level supervisor, and then the next level supervisor, and so on, reports "up the chain of command."  It was to this situation the District Court alluded when it referred to a plaintiff's attempts to "tak[e] a complaint up the chain of command to find someone who will take it seriously . . . ."  J.A. 76 (quoting *Ross*, 693 F.3d at 307) (alterations in original). Indeed, even in *Davis*, where the Fifth Circuit found that Davis reported within her chain of command, the court's decision was aided by the fact that Davis had testified that, although she had never had occasion to "go over the head" of the president of her organization unit, if she needed to do so, she would have contacted the chancellor to whom she ultimately sent her letter.  *Davis*, 518 F.3d at 315-16.

Neither *Ross* nor *Davis* stand for the proposition that a low-level public employee who skips over literally every intermediate level of management within his organization to report illegal conduct to the titular head of that organization necessarily speaks within his chain of command for purposes of *Garcetti*.  Neither should this court countenance such an assault on the First Amendment rights of government workers.  Requiring a public employee to speak to individuals outside his agency, or to the media, in order to enjoy First Amendment protection would come close to contravening *Garcetti's* principal warning that "public employees do not surrender all their First Amendment rights by reason of their employment"

31

*Garcetti*, 547 U.S. at 417, as it creates a presumption that all speech internal to an organization is "pursuant to official duties" and therefore is unprotected by the First Amendment.

The Court should conclude that Mr. Mpoy has adequately alleged that he did not speak as a public employee because his speech was not pursuant to his official duties, and, moreover, because he did not speak within his "chain of command."

### B. Mr. Mpoy Spoke About A Matter of Public Concern, At Minimum, When He Alleged That Presswood Had Falsified Student Achievement Records.

The second factor the Court must examine is whether Mr. Mpoy spoke on a matter of public concern. *See Bowie*, 642 F.3d at 1133. A "public concern" is "something that is a subject of legitimate news interest" as demonstrated by the "content, form, and context of a given statement, as revealed by the whole record." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004). Moreover, it is inconsequential if only part of the plaintiff's speech relates to a matter of public concern. Even if there is some "personal motivation for an employee's speech," it does not "destroy the character of a communication as one of public concern." *LeFande v. Dist. of Columbia*, 613 F.3d 1155, 1162 (D.C. Cir. 2010).

That Mr. Mpoy spoke on matters of public concern was not challenged by Appellees in the district court, nor addressed in the court's memorandum opinion. Regardless, whether or not the rest of his email to Rhee constituted matters of

32

public concern, at minimum, Mr. Mpoy's disclosure that Presswood falsified test scores and fabricated levels of student achievement addressed a matter of substantial public concern, as is evidenced by the media scrutiny DCPS has endured related to cheating on standard achievement tests. *See, e.g.*, Jack Gillum and Marisol Bello, *When standardized test scores soared in D.C., were the gains real?*, USA TODAY, Mar. 30, 2011; Tom Howell Jr., *Investigation finds cheating at D.C. schools*, Washington Times, June 22, 2012; Emma Brown, *Federal complaint details cheating allegations at D.C. public school*, Washington Post, Jan. 7, 2013.  Courts have generally agreed that cheating within the public school system is an issue of public concern.  *See, e.g., Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) (finding that cheating on standardized achievement tests was issue "of serious interest to the community").  Importantly, the Complaint plainly alleges that the matters reported to Rhee were of public concern.  J.A. 36, at ¶¶ 115.  And even if the rest of his statements to Rhee might be considered to be borne of Mr. Mpoy's "personal motivation," that does not "destroy the character" of his statements regarding Presswood's falsification of test scores.

### C. The Complaint Sufficiently Alleges that Mr. Mpoy's Protected Speech was A Substantial or Motivating Factor Behind His Termination, and That Any Alternative Justification for His Termination is Mere Pretext.

The final factors the Court must consider are whether Mr. Mpoy has sufficiently alleged that his disclosures to Rhee were a substantial or motivating

factor for his termination, and, relatedly, whether he can refute claims that
Appellees would have taken the same action even if he had not engaged in
protected speech. *Bowie*, 642 F.3d at 1133. To show that the protected speech was
a substantial or motivating factor behind retaliatory conduct, a plaintiff may allege
that there was "proximity in time between the protected action and the allegedly
retaliatory employment decision." *Keyser v. Sacramento City Unified Sch. Dist.*,
265 F.3d 741, 751 (9th Cir. 2001) (citation omitted); *see also Clark Cnty. Sch.
Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (citing cases finding temporal
proximity of three months and four months insufficient to demonstrate causal
connection), *cited in Wilburn*, 480 F.3d at 1143 n.3; *Jones v. Quintana*, 831 F.
Supp. 2d 75, 87 (D.D.C. 2011) (complaint "adequately supported" that the speech
was a substantial or motivating factor due to close proximity of only a few days
between the alleged speech and plaintiff's placement on administrative leave). A
plaintiff may also meet the burden by alleging that the "employer's proffered
explanations for the adverse employment action were false and pretextual."
*Keyser*, 265 F.3d at 752; *Am. Postal Workers Union v. U.S. Postal Serv.*, 830 F.2d
294, 311 (D.C. Cir. 1987) ("The circumstantial evidence . . . strongly suggests that
the Postal Service's asserted reason for firing [plaintiff] was merely a pretext"
because plaintiff had "an exemplary record . . . ."). The Complaint pleads
sufficient facts to satisfy either test.

It is plain that Mr. Mpoy's termination was close in time to his protected speech. Mr. Mpoy emailed Rhee on June 2, 2008, requesting an investigation and alleging numerous abuses and violations of law by Presswood, including Presswood's falsification of student achievement records. J.A. 32, 33, at ¶¶ 86, 92. A mere two days later, on June 4, Mr. Mpoy was summoned to Presswood's office, where Presswood threatened that he would recommend Rhee terminate Mr. Mpoy's employment. J.A. 32, at ¶¶ 87-88. Little more than a month later, on July 9, 2008, Mr. Mpoy was called to a meeting with Rhee's representative, Ronald Williams, who confirmed that Presswood had in the interim recommended his termination to Rhee and that he should expect to receive a termination notice. J.A. 33-34, at ¶¶ 94-95, 97. The termination letter was dated six days later, July 15, 2008 (although Mr. Mpoy did not receive it until mid-August). J.A.34, at ¶ 101. In total, fewer than six weeks elapsed between Mr. Mpoy's report of Presswood's cheating and his formal termination, although the Complaint plainly alleges that Presswood intended to seek his termination no more than two days later, and Rhee followed this recommendation sometime before July 9. His termination therefore occurred in close proximity to his speech, supporting the inference that his speech was a substantial motivating factor for that termination.

Moreover, the Complaint also adequately alleges that any other justification for his termination is mere pretext. The Complaint states that "Mr. Mpoy's

35

performance during his tenure at Ludlow was excellent," and that he "received praise and approval from his colleagues and from the parents of his students," who said he was "a hardworking teacher who was effective in improving his students' abilities and was consistently trying to improve his teaching skills." J.A. 21, 33, at ¶¶ 3, 91. It likewise refutes the factual basis for Presswood's negative comments about Mr. Mpoy. J.A. 31-32, at ¶¶ 79, 80, 81. The Complaint also alleges that his suspension for supposed insubordination and failure to conduct a classroom observation was also unsubstantiated. J.A. 32, at ¶ 83. And it was not until after Mr. Mpoy raised his allegations to Rhee that Presswood threatened not to recommend Mr. Mpoy for renewal and issued his damning evaluation of Mr. Mpoy's performance, despite never having done an interim evaluation or conducted a second classroom observation. J.A. 33, at ¶ 90. Construing these allegations liberally in Mr. Mpoy's favor, it is clear that he has adequately alleged that any alternative justification for his termination was mere pretext for his disclosures to Rhee, and that he would not have been terminated but for his protected speech.

These allegations also satisfy the final factor the Court must consider: whether Mr. Mpoy can refute Appellees claims that they still would have fired him in the absence of his protected speech. With no record to refute at the pleadings stage, it is sufficient that Mr. Mpoy has pleaded that any other justification is mere

pretext.  Appellees have pleaded that Mr. Mpoy was fired for "reasonable factors other than retaliation" and "for good cause."  J.A. 17, Dkt. No. 100 at 18. Construed in the light most favorable to Mr. Mpoy, the Complaint suffices to demonstrate that these ambiguous justifications are mere pretext.

Because Mr. Mpoy spoke as a citizen and not pursuant to his official duties when he reported Presswood's falsifications—a subject of substantial public concern—and because his speech was a substantial motivating factor behind his termination, for which any other justification has been alleged to be pretext, the District Court erred in dismissing Mr. Mpoy's § 1983 retaliation claim.  This Court should reverse the District Court and remand this case to proceed.

## II.    Rhee and Presswood Are Not Entitled to Qualified Immunity Because Mr. Mpoy's Right to Be Free of Retaliation For Exercising His Right to Free Speech Was Clearly Established in 2008.

Granting qualified immunity to Rhee and Presswood for retaliating against a special education teacher for exposing waste, fraud, and unethical conduct, including falsification of student test scores at Ludlow, would contravene well-established First Amendment jurisprudence and sanction the unconstitutional actions of two public school officials.  *See* J.A. 35-36, at ¶¶ 111-117.  Mr. Mpoy was under no duty as a teacher to make the disclosures he made by e-mail to Rhee, particularly that Presswood falsified student records "to misrepresent [student] performance on assessments and other measures of progress and achievement," an

issue of great sensitivity for DCPS and a matter of public concern.  J.A. 21, 33, 35-36, at ¶¶ 1, 92-93, 111-112, 115-116.  At the time of the retaliation, it was clearly established that a government employer could not retaliate against an employee for speech made outside his job duties.  It was unlawful for Rhee and Presswood to terminate Mr. Mpoy for his disclosures.  Conferring qualified immunity here would empower school administrators to retaliate against teachers who speak out against institutionalized fraud and corruption.  This Court should deny Rhee and Presswood's application for qualified immunity.

### A.    The Qualified Immunity Defense.

The doctrine of qualified immunity "protects government officials performing discretionary functions from civil consequences insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Navab-Safavi v. Glassman*, 637 F.3d 311, 314 (D.C. Cir. 2011) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, (1982)) (internal quotation marks omitted).  "As is apparent in the very terminology employed, qualified immunity is not absolute."  *Id.* at 317.

To determine whether a government official is entitled to qualified immunity, the Supreme Court established a two part test in *Saucier v. Katz*, 533 U.S. 194 (2001).  The court must evaluate: (1) whether "the facts alleged show the officer's conduct violated a constitutional right"; and (2) "whether the right was

38

clearly established." 533 U.S. at 201. As to the first prong, the court must

consider the facts in the complaint "in the light most favorable to the party

asserting the injury." *Id.*

The first prong is discussed in detail in the prior section. Under the second

prong, the court must ask whether the state of the law gave the defendants "fair

warning" that their retaliation was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730,

741 (2002). "The contours of the right must be sufficiently clear that a reasonable

official would understand that what he is doing violates that right." *Saucier*, 533

U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). To be

clearly established, the right allegedly violated "must be identified at the

appropriate level of specificity . . . ." *Butera v. Dist. of Columbia,* 235 F.3d 637,

646 (D.C. Cir. 2001) (quoting *Wilson v. Layne,* 526 U.S. 603, 615 (1999) (internal

quotations omitted)).

This does not mean, however, that qualified immunity applies "unless the

very action in question has previously been held unlawful." *Hope*, 536 U.S. at

739. Requiring that facts in a previous case be "materially similar" to the situation

at hand is too "rigid" and inconsistent with the Court's qualified immunity

precedent. *Id.* "Prior decisional law need not have supplied a 'precise

formulation' of the applicable constitutional standard in order to overcome an

official's qualified immunity . . . ." *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C.

Cir. 2006), nor must prior cases be "fundamentally similar." *Hope*, 536 U.S. at 741. "General statements of the law" may give "fair and clear warning." *Id.* at 741 (quoting *United States v. Lanier,* 520 U.S. 259, 271 (1997)). Under the second prong, therefore, the question is whether the defendant had fair notice that his or her conduct could reasonably be understood to be a constitutional violation.

### B. Rhee and Presswood Cannot Plausibly Maintain That A Reasonable Official Would Not Have Known He Was Violating Mr. Mpoy's First Amendment Right to Speak As A Citizen On Matters of Public Concern.

Rhee and Presswood both asserted in the District Court that qualified immunity applies because the right at issue was not clearly established at the time of their retaliatory conduct. *See* J.A. 45-46. They argued both that the standard applicable to their conduct was not clearly established, and that there is no possible way they could have known that Mr. Mpoy's speech was protected. Neither assertion is correct. If accepted, their view would erroneously so restrict First Amendment rights that no public employee could assert a violation for speech related to his employment even when he had no affirmative duty to report it.

Here, under the first qualified immunity prong, whether a First Amendment violation has occurred depends on whether the speech (1) was within Mr. Mpoy's professional responsibilities; or (2) was beyond his duties as a special education teacher. Mr. Mpoy has sufficiently alleged that at least some of his speech fell outside of his duties. The Complaint also alleges that Mr. Mpoy's speech was

40

related to a matter of public concern, that he was speaking as a private citizen, and that his speech was a substantial or motivating factor for his termination.  With respect to the second prong, as discussed below, the First Amendment rights of public employees were sufficiently clear in July 2008 to give Rhee and Presswood fair warning that their retribution against Mr. Mpoy clearly violated his rights.

### C.    Mr. Mpoy's Right to Speak As A Citizen on Matters of Public Concern Was Clearly Established in 2008.

In determining whether a right is "clearly established" for qualified immunity purposes, the Court's analysis should focus on the legal clarity of the employee's *right*, not the misconduct of the employer.  A public employee's First Amendment right to speak freely on issues of public importance is well-established by Supreme Court jurisprudence, which circuit and district courts have affirmed and echoed many times, so that government managers may not claim they lack notice of their employees' rights.

### 1.    *Garcetti* did not alter the qualified immunity analysis, and the District Court erred in holding that confusion about *Garcetti's* application meant that reasonable officials would not have known that their actions violated Mr. Mpoy's rights.

The District Court erroneously held that Rhee and Presswood are entitled to qualified immunity because the "uncertainty of the public-employee-speech jurisprudence as it applies to teachers in different settings," meant that the right at issue was not "clearly established."  J.A. 78.  The Court erred in basing its

41

qualified immunity determination on lower courts' post-*Garcetti* refinement of the standard.  This is an inappropriate way to determine whether a Constitutional right was clearly established; under this approach public employers would always be entitled to qualified immunity.  *See Doucette v. Minocqua, Hazelhurst & Lake Tomahawk Joint Sch. Dist. No. 1*, No. 07-292, 2008 WL 2412988, at *8 (W.D. Wis. June 12, 2008) (denying qualified immunity despite "gray area between speech made pursuant to an official duty and speech made as a citizen").

In the broad scheme of public employee speech jurisprudence, *Garcetti* clarified the standard for public employees when applying the first prong of the *Pickering-Connick* framework.  The District Court here improperly held that the right at issue was not "clearly established" because there was a question whether *Garcetti* applied in the academic context.  The proper focus, however, is that Mr. Mpoy's right to speak freely was clearly established, and therefore, Rhee and Presswood were on notice that their retaliation violated his First Amendment rights.

As applied in this Circuit, the *Pickering-Connick* framework provides a four-factor test for determining whether a public employee may make out a claim of retaliation in violation of his First Amendment rights, requiring that:  (1) the employee spoke as a citizen on a matter of public concern; (2) the governmental interest in efficiency "outweighs the employee's interest, as a citizen, in

42

commenting upon matters of public concern, and the interest of potential audiences in hearing what the employee has to say"; (3) the "speech was a substantial or motivating factor" for the retaliatory action; and (4) the employer would not have reached the same decision absent the protected speech. *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998).

In *Garcetti*, the Supreme Court refined the first prong, holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421. Yet *Garcetti* did not change the essence of the *Pickering-Connick* standard, particularly as it relates to teachers' speech as a subset of public employees. In setting forth the standard for what kind of speech is made pursuant to one's official duties, the *Garcetti* Court specifically exempted certain speech that teachers make from being characterized as pursuant to a teacher's job duties:

> The First Amendment protects some expressions related to the speaker's job. As the Court noted in *Pickering:* "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."

547 U.S. at 421 (citations omitted). The Court distinguished teachers' speech in *Pickering* on the operation of schools from the speech made pursuant to the prosecutor's job duties in *Garcetti*. *Id.*

43

Other Circuits have recognized that the qualified immunity analysis in this First Amendment arena is clear as ever. *See, e.g., Lindsey v. City of Orrick*, 491 F.3d 892, 897, 902 (8th Cir. 2007) (public employer may not discharge employee for disclosing potential illegal conduct of public officials). *Cf. Cioffi v. Averill Park Central School District Board of Education*, 444 F.3d 158, 167 n. 3 (2d Cir. 2006) (forthcoming *Garcetti* decision on First Amendment protection of purely job-related speech on matter of public concern would not affect disposition of case because plaintiff's speech not made strictly pursuant to duties as public employee)

*Garcetti* did not change the "general rule, set out in *Pickering* and countless other cases, that it is unlawful to terminate an employee for exercising their First Amendment rights." *Modica v. Humphrey*, No. A-02-CA-722 AWA, 2007 WL 2777779, at *5 (W.D. Tex. Sept. 21, 2007). For qualified immunity purposes, "nothing about the change affected by *Garcetti* is relevant to the question of whether [the plaintiff's] right infringed upon by . . . harassment and firing was 'clearly established' . . . ." *Id.*

*Garcetti* itself confirms this. As a teacher, Mr. Mpoy was "most likely to have informed and definite opinions as to . . . the operation of the schools," and therefore his right "to speak out freely on such questions without fear of retaliatory dismissal" was well established and affirmed by the *Garcetti* Court. *See* 547 U.S. at 421 (quoting *Pickering*, 391 U.S. at 572). *Garcetti* specifically distinguished

44

teachers' speech related to the operation of schools from speech made pursuant to one's duties.  *Id.*  Therefore, *Garcetti* did not change the qualified immunity analysis regarding whether Mr. Mpoy's right to speak freely as a public employee was clearly established.  In other words, it is immaterial whether *Garcetti* does or does not apply in the academic setting.  Both before and after *Garcetti*, Mr. Mpoy's right was clearly established.

### 2.     Courts have found a public employee's right to be clearly established in similar circumstances.

An analysis of the state of the law at the time the retaliatory action was taken is instructive.  *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  To determine whether a constitutional right is clearly established, this Court looks at cases from the Supreme Court, this Court, and other courts to find a consensus view – if there is one.  *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (quoting *Johnson v. Dist. of Columbia,* 528 F.3d 969, 976 (D.C. Cir. 2008)).

The First Amendment right of public employees to be free from retaliation for their speech on issues of public concern had been established for decades by the time Rhee and Presswood retaliated against Mr. Mpoy in 2008.  The Supreme Court first held in *Pickering* in 1968 that "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment."  391 U.S. at 574.  The Court recognized that "[i]t is clearly established that a State may not discharge an employee on a basis that infringes

45

that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). After *Garcetti*, courts continued to find that the law in this area had been clearly established for decades. *See, e.g.*, *Lindsey*, 491 F.3d at 902 ("[I]t [is] clearly established a public employer may not discharge an employee for disclosing the potential illegal conduct of public officials.").

The courts have so fully articulated and repeatedly applied the general principles governing First Amendment retaliation as to "put the constitutional question beyond debate." *Jones v. Quintana*, 831 F. Supp. 2d 75, 88 (D.D.C. 2011) (discussing state of law in January 2008 for qualified immunity purposes). In an opinion that Rhee or Presswood might have read before their reprisal against Mpoy, the Eighth Circuit effectively summarized the protection that the First Amendment provides for public employees who disclose wrongdoing:

> This court has taken a broad view of what constitutes clearly established law for the purposes of a qualified immunity inquiry. . . . [N]o right is more clearly established than freedom of speech, and . . . speech alleging illegal misconduct by public officials occupies the highest rung of First Amendment hierarchy. . . . This court has held it clearly established a public employer may not discharge an employee for disclosing the potential illegal conduct of public officials.

*Lindsey*, 491 F.3d at 902 (internal citations and quotations omitted).

The broad consensus concerning the First Amendment rights of public employees to speak on matters of public interest belies Rhee and Presswood's

46

attempt to circumscribe the right at issue in a fashion that would foreclose nearly all public employees' First Amendment rights.  The right clearly established here is that a public employer may not retaliate against an employee for speaking as a citizen on a matter of public concern if the speech was made outside of his job duties.  *See Miller v. Jones*, 444 F.3d 929, 939 (7th Cir. 2006) (denying qualified immunity because "[i]t is well established by the Supreme Court and this circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights" despite the fact that "the boundaries of the public concern test are not well-defined"); *Sanders v. Dist. of Columbia*, 522 F. Supp. 2d 83, 85, 90 (D.D.C. 2007) (denying qualified immunity because "a reasonable MPD official surely would have known that retaliating" against a police officer for speech disclosing "a pattern of certain employees abusing time and attendance policies . . . violated a clearly established right"); *Modica v. Humphrey*, 2007 WL 2777779, at *3-5 (denying qualified immunity because right was "clearly established" when director of state agency retaliated against agency inspector who disclosed problems with the operation of the agency, including "cheating on numbers to make performance levels higher"); *McLaughlin v. Pezzolla*, No. 06-CV-00376, 2007 WL 676674, at *9 (N.D.N.Y. Feb. 28, 2007) ("[I]t was clearly established that . . . the First Amendment . . .  prohibits [a governmental entity] from punishing its employees in retaliation for the content of their speech on

47

matters of public importance.  An employee's right to be free from such retaliation

has been clearly established since at least 1968.") (internal citation and quotations

omitted).  This firmly established standard was enough to put Rhee and Presswood

on notice of Mr. Mpoy's rights, and to reasonably conclude that their retaliation

would violate those rights.  If this Court were to "accept[] the defendants' view of

what it means for the law to be clearly established, qualified immunity would be

available in almost every case . . . ."  *Kinney v. Weaver*, 367 F.3d 337, 371 (5th

Cir. 2004) (denying qualified immunity for law enforcement officials who

boycotted police academy instructors for testifying against other officers in

excessive force cases).

### 3.     Rhee and Presswood had fair warning that Mr. Mpoy's speech was protected.

Under the broad standard applicable to the qualified immunity analysis, and

given the conduct alleged in the Complaint, it is beyond the pale that Rhee and

Presswood plausibly fathomed they could terminate Mr. Mpoy for speaking out

about institutionalized fraud and corruption.  Mr. Mpoy reported by e-mail to

Rhee, the Chancellor of DCPS and a high-profile advocate for education reform,

that Presswood "misrepresented students' performance and results on the DC-CAS

Alternative," and requested an investigation into this and other malfeasance at

Ludlow.  J.A. 52; J.A. 22, 33, 35-36 at ¶¶ 10, 92-93, 111, 115.  As a special

education teacher, Mr. Mpoy had no duty to make these disclosures.  J.A. 15-16 at

¶¶ 112, 116.  The e-mail was sent long after school hours and from Mr. Mpoy's personal e-mail address.  J.A. 52.  "Accusations that student tests and test scores have been altered . . . is an issue of great sensitivity" for DCPS, and as such, is undoubtedly a matter of great public concern.  J.A. 21, at ¶ 1.  The notion that Rhee and Presswood could not have recognized that this disclosure was a matter of utmost public importance, and outside of Mr. Mpoy's employment duties, is both absurd and contrary to the allegations of the Complaint.  Rhee and Presswood were on notice that Mr. Mpoy's speech was protected.

The D.C. Circuit has not directly addressed the issue of whether a public school teacher's speech to the top public school official disclosing the alteration of student test scores, as well as other fraud, waste, and misconduct, is protected speech.  However, the Supreme Court and other circuits provided Rhee and Presswood with fair warning of Mr. Mpoy's free speech rights.

### i.     It was clearly established in 2008 that Mr. Mpoy's speech involved a matter of public concern.

As is discussed in Section 1.B., Mr. Mpoy's speech clearly involved a matter of public concern, and was therefore protected.  In the Second Circuit case of *Bernheim v. Litt*, an elementary school principal misrepresented the achievements of students at the school and "published false statistics concerning test scores of the students for the purpose of enhancing his own reputation and that of the school." 79 F.3d 318, 323 (2d Cir. 1996).  The plaintiff, a teacher at the school, reported the

49

principal's "misrepresentations regarding the false test scores and student

achievements to various authorities including the Superintendent of Schools . . . ."

*Id.* at 323-24.  The Second Circuit found that:

> [The teacher]'s statements regarding the quality of education provided
> by the public school as measured by achievement test scores and their
> year-to-year improvement or deterioration on a schoolwide basis may
> reasonably be considered a matter of public concern.  These are issues
> of serious interest to the community and [the teacher] should be able
> to speak freely about them without fear of retaliation.

*Id.* at 325.

Rhee and Presswood could not reasonably doubt that Mr. Mpoy's disclosure

that Presswood was misrepresenting student test scores and student achievement

was a matter of public concern.

### ii.    It was clearly established in 2008 that Mr. Mpoy's speech was not made pursuant to his duties as a special education teacher.

Mr. Mpoy's complaints regarding the falsification of student performance

and results of the DC CAS Alternative were not made pursuant to his job duties as

a special education teacher.  Disclosure of unethical conduct, corruption, and other

wrongdoing by employees in positions that have no inherent authority to effect

change regarding misconduct in their place of employment is clearly not a part of

their job responsibilities.

In *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1199

(10th Cir. 2007), several teachers at an elementary school discussed a number of

50

concerns about the operation, management, and mission of the school.  While many of the matters discussed fell within the teachers' duties, the court distinguished a "handful of the matters discussed" that "were unrelated to Plaintiffs' employment duties and constituted matters of public concern."  *Id.*  The court noted that "[a]s teachers, Plaintiffs had no supervisory responsibility and no duty to report with regard to any of the problems being discussed, nor does it appear that Plaintiffs' discussion of these matters occurred during the performance of their official duties because the discussions occurred after hours and outside of the Academy."  *Id.* at 1205.

The court's decision in *Brammer-Hoelter* is in accord with the prevailing case law in this Circuit in 2008.  In the decisions then available from this Court applying *Garcetti*, although the Court had not yet articulated the "attempt to implement a job function" test, the Court nevertheless consistently inquired whether the employee was, via their speech, carrying out the tasks they were hired to perform. *See, supra, Thompson*, 530 F.3d at 918 (reports by employee with responsibility to protect the integrity of the D.C. Lottery concerning misconduct by members of Lottery Board were made pursuant to the functions of his job); *Wilburn*, 480 F.3d at 1150 (employee specifically and officially tasked with rooting out discriminatory employment practices spoke pursuant to official duties when reporting discriminatory promotion denials).

51

As alleged, Mr. Mpoy's speech disclosed that Presswood directed him to change and falsify test scores and to otherwise fabricate levels of student achievement. J.A. 52; J.A. 22, 33, 35-36, at ¶¶ 10, 92-93, 111, 115. His speech occurred long after school hours: he sent his e-mail to Rhee at 12:38 a.m. on Monday June 2, 2008, from his personal e-mail address. J.A. 52. Mr. Mpoy was not responsible for Ludlow's compliance with No Child Left Behind and the DC-CAS Alternative. *See* J.A. 29-30, 35-36, at ¶¶ 63-66, 112, 116. Like the Plaintiffs in *Brammer-Hoelter*, the speech did not "occur[] during the performance of [his] official duties," and was not pursuant to any duty to report Presswood's conduct. *See Brammer-Hoelter*, 492 F.3d at 1205. *See also Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 437 F. Supp. 2d 235, 243 (D. Del. 2006) (teacher's journal documenting co-teacher's misconduct was "not written pursuant to his official duties as a teacher. He was not employed to monitor . . . fellow teachers"); *Sanders v. Dist. of Columbia*, 522 F. Supp. 2d 83, 85, 89 n.3 (D.D.C. 2007) (speech not pursuant to duties where police officer supervising special division reported a "pattern of certain employees abusing time and attendance policies" because "it does not appear that [the officer] made these statements . . . pursuant to his official duties").

Mr. Mpoy was a special education teacher and like the plaintiffs in *Brammer-Hoelter*, he "had no supervisory responsibility and no duty to report with

regard to any of the problems" he raised about Presswood.  *See Brammer-Hoelter*, 492 F.3d at 1205.  He was not an administrator; he had no operational or compliance-related responsibilities.  He had "no duty, contractually or otherwise" to make the disclosures that he made.  J.A. 35-36, at ¶¶ 112, 116.  Rhee and Presswood knew this, and consequently, had fair warning that his speech was not made pursuant to his duties.  The First Amendment right at issue here was clearly defined for qualified immunity purposes, and a reasonable official in Rhee and Presswood's shoes would have known that Mr. Mpoy's speech was outside the scope of his employment duties, and was therefore protected.

Rhee and Presswood's qualified immunity application must be denied.

## CONCLUSION

Public school teachers should not be silenced for exposing institutionalized fraud and corruption.  Mr. Mpoy was terminated from his position as a special education teacher for disclosing cheating and fraudulent test results by the principal at his school to the Chancellor of the school system.  His speech is protected by the First Amendment because his disclosure fell outside of his duties as a teacher.  That the speech was internal to DCPS does not remove it from this protection.  Rhee and Presswood are not entitled to qualified immunity because, at the time of the retaliation, Mr. Mpoy's right to free speech was clearly established,

and any reasonable public employer would have understood that retaliation would violate that right.

The decision of the District Court should be reversed, and this case should be remanded for discovery and trial.

Respectfully submitted,

Dated:  July 10, 2013       /s/    Stewart Manela
                            Stewart Manela (D.C. Bar No. 948679)
                            Jason D. Moore (D.C. Bar No. 989364)
                            Rachel Witriol (D.C. Bar No. 1002907)
                            Arent Fox LLP
                            1717 K Street, NW
                            Washington, DC  20036-5342
                            (202) 857-6000
                            Fax: (202) 857-6395
                            manella.stewart@arentfox.com
                            moore.jason@arentfox.com
                            witriol.rachel@arentfox.com

                            *Attorneys for Appellant Bruno K. Mpoy*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)

because this brief contains 13,199 words, excluding the parts of the brief exempted

by Fed. R. App. P. 32(a)(7)(B)(iii).


Dated:        July 10, 2013                    /s/    Stewart S. Manela
                                                     Stewart S. Manela

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Appellant's Brief was served upon the following

counsel of record, on this 10th day of July, 2013, via the Court's CM/ECF system:

>William L. Drake, Esq.
>1330 Connecticut Ave., NW
>Washington, DC 20036
>wdrake@steptoe.com
>
>Donna M. Murasky
>Richard S. Love
>Office of the Attorney General, District of Columbia
>Office of the Solicitor General
>441 4th Street, NW
>One Judiciary Square, Sixth Floor
>Washington, DC 20001-2714
>donna.murasky@dc.gov
>richard.love@dc.gov

Dated:        July 10, 2013                    /s/     Stewart S. Manela
                                                        Stewart S. Manela